A. T. DANICO, Executor of the Estate of JOHN R. BROOKS, Appellee, v. M. A. FORD, Appellant.

No. 45324.

NOVEMBER 12, 1941.

J. C. Hall and Bollinger & Donegan, for appellant.

Newport & Steffen and Cosson, Stevens & Cosson, for appellee.

OLIVER, J.—Plaintiff, John R. Brooks, alleged that in August, 1922, he entered into an oral agreement with defendant, M. A. Ford, in which they formed an equal partnership for the purpose of manufacturing files and other metal products at Davenport, Iowa, and that said partnership and business was still in operation; that defendant had recently refused to recognize the existence of said partnership, had taken over said business and the partnership assets and refused to account therefor, and that said assets were being wasted. Plaintiff prayed for the dissolution of the partnership, an accounting of its affairs, the appointment of a receiver therefor, the rescission of a written contract between the parties made in 1930, and involving certain partnership rights, and for general equitable relief. Defendant denied the existence of the partnership and the right to rescind the 1930 contract and alleged he was sole owner and proprietor of the business and assets in question. The decree of the trial court granted plaintiff the relief prayed and defendant has appealed. Plaintiff having died after the appeal was taken, the executor of his estate was substituted as appellee herein. However, for convenience, we will refer to decedent as appellee.

I. Appellant, a toolmaker, then aged 31 years, was, in 1922, engaged in the business of selling automobile luggage carriers, which were constructed in part by him. He had a few tools and other equipment and some of the carriers. The business was unsuccessful, its gross receipts were very small and appellant was without funds. Appellee, then aged 61 years, was an expert file cutter. He testified that in August, 1922, he

suggested to appellant that they go into the business of making files, stating he (appellee) had the tools. Appellant said he had no money and appellee then said, "I will take care of myself, and I will furnish the money to get the tools necessary to start the business, which may take a year or may take two years; and you have got to have a lot of courage in this business, because you are going into something you don't absolutely understand." Appellant said, "We will go 50-50", to which appellee assented.

Appellee purchased or advanced funds for the purchase of supplies and equipment necessary to start the business and later for some of the expenses of operation. For several years the two men worked together at making files. The business was then small and was operated under difficulties. Subsequently, it grew into a substantial business, which employed a number of workmen and had gross earnings amounting to as much as $45,000 per year. In the beginning appellee did the actual work of file cutting, and later was in general charge of that end of the business. The business was operated under the name of M. A. Ford Manufacturing Company, appellant at all times having charge of the office end of the business. Its bank accounts were kept in that name or appellant's name. Appellant, from time to time, made withdrawals for his living expenses and other individual purposes. Appellee drew nothing until April, 1924, after which time he drew a salary which varied between $10 and $40 per week.

Appellant's story is that the file making business was suggested to him by others and that appellee, being then unemployed, loaned appellant the money necessary for appellant to go into said business, agreeing to work without charge until the business should become profitable, "and I could pay him a salary or wages when I was able to pay him out of the profits of the business."

On July 9, 1925, appellant filed in the office of the county recorder a sworn statement of trade name of M. A. Ford Mfg. Co., in which he listed appellant and appellee as the persons interested in said business. M. A. Ford Mfg. Co. filed a federal partnership return of income for the year 1925, signed and verified by appellant and appellee, naming appellant and appel-

lee as partners, and listing each as entitled to 50 percent of the net income. Thereafter, for each calendar year to and including the year 1938, a federal partnership return of income of M. A. Ford Mfg. Co. was signed and sworn to by appellant (except one return, which was signed and sworn to by appellant's attorney). In each of said returns appellant and appellee were listed as the partners. Beginning with the year 1934, appellant likewise annually made partnership returns of income of M. A. Ford Mfg. Co., to the state, in each of which, under oath, he listed appellant and appellee as the partners. A number of the state and federal returns were prepared for appellant by his attorney. On July 21, 1930, appellant and appellee entered into a written agreement, prepared by appellant's attorney, which recites that said parties are co-partners under the name of the M. A. Ford Manufacturing Company, and mentions the interest of each party in said company. (This contract is hereinafter set out at length.)

There was other evidence, reference to which appears unnecessary. Appellant's explanation of the various signed statements is that because appellee was being paid wages based upon the profits of the business, appellant understood there was what he called "a working partnership". Appellant makes no explanation for the listing, in the first three income tax returns, of the percentage of the net income of each partner at 50 percent or one half.

In argument appellant contends there was here no agreement to share losses, and makes reference to a frequently cited statement in Malvern National Bank v. Halliday, 195 Iowa 734, 192 N. W. 843, that one of the salient features of an ordinary partnership is a community of interest in profits and losses. However, the court, in that case, also stated at page 738 of 195 Iowa, page 846 of 192 N. W.:

"The mutual liability for losses may and will be implied where the fact of partnership is established by other evidence."

In this case the parties agreed to "go 50-50." In addition, their conduct and written declarations furnish cogent proof of their mutual recognition of the partnership status and the resultant implication of an agreement to share losses.

1242

The trial court found appellee had proven the partnership as alleged in his petition, and we think the record as a whole clearly, convincingly and satisfactorily establishes this conclusion.

II. Another proposition relates to the written contract of July 21, 1930. Appellant testified he had heard appellee was making claim to a partnership interest in the business and that he (appellant) consulted with his attorney, who, as attorney for appellant, prepared the contract. Appellant discussed the contract with appellee and took appellee to the office of appellant's attorney where said contract (referred to as Exhibit A) was executed by both parties, as follows:

"THIS AGREEMENT made by and between M. A. FORD, First Party, and JOHN R. BROOKS, Second Party, WITNESSETH:

"That said parties are co-partners under the name of the M. A. Ford Manufacturing Company.

"That said parties have agreed, and do hereby agree, that the First Party shall cause a life insurance policy to be written in the amount of Seven Thousand ($7,000.00) Dollars with the First Party as the assured and the Second Party as the beneficiary.

"That the parties hereto have agreed, and do hereby agree, that during the life of the Second Party the First Party shall keep the premiums paid on the aforesaid insurance policy and shall not change the beneficiary, but, if the First Party survives the Second Party, the First Party shall have the right to change the beneficiary in said insurance policy after the death of the Second Party.

"That the parties hereto have agreed, and do hereby agree, that if the Second Party shall die prior to the death of the First Party, the interest of the Second Party in the M. A. Ford Manufacturing Company shall forthwith become the property of the First Party and, if the First Party shall die prior to the death of the Second Party, the interest of the Second Party in the M. A. Ford Manufacturing Company shall forthwith become the property of the Estate of the First Party."

This contract recognized the existence of the partnership. As modified by the new contract, the original partnership agreement continued in force and effect. The new contract provided that upon the death of either partner, appellee's interest in the partnership should terminate and become the property of appellant or appellant's estate. This language, when considered with the context, necessarily leads to the deduction that the partnership and appellee's interest therein should not terminate until said time. The benefits to be received by appellee under the contract consisted of his right to participate in the partnership, therein recognized, as long as he and appellant both lived, and in the event appellant, who was 30 years the younger, should predecease him, to receive the proceeds of the policy of life insurance.

Appellant procured and retained in his own possession the insurance policy, which named appellee as beneficiary, if living at appellant's death, or if not living, appellant's wife. In January, 1939, he called at the place where appellee was confined by illness and secured appellee's signature to an assignment of the policy. This assignment was made so that appellant could assign the policy to a bank as security for a loan to buy machinery for the business. That was done.

The petition, filed March 13, 1939, alleged:

"That the consideration for said agreement was wholly inadequate and that the defendant has caused plaintiff to assign away his interest in the life insurance policy provided for in plaintiff's Exhibit 'A', and that at this time there is no consideration for a continuation of such executory contract and the same should be annulled and held for naught."

Appellant contends the consideration for appellee's entering into the contract was appellant's promise to take out the insurance, make appellee beneficiary and keep the premiums paid and states that appellant fully performed his part of the agreement. We do not think this was all or the principal part of the agreement. The parties agreed the business was a partnership and that said partnership should continue until the death of one of the partners. That part of the agreement was

1244

the very foundation or root of the contract. Subsequently, appellant repudiated this agreement by denying the partnership and refusing to recognize appellee's status as a partner.

Appellee's benefit from the life insurance was contingent only and the probability of its realization was not great. The policy (which had been assigned to a bank) would be payable to appellee only in the event the much younger man should precede him in death. The only benefit or consideration relatively certain to be received by appellee was the recognition and enjoyment of his status and rights as a partner in the future as well as at the time of the contract. Appellant's repudiation of the partnership and contract deprived appellee of this.

In Collier v. Rawson, 202 Iowa 1159, 211 N. W. 704, which was an action at law for damages resulting from the renunciation of a continuing executory contract, the court said at page 1161 of 202 Iowa, page 705 of 211 N. W.:

"It is now well settled that the final renunciation by one party of a contract providing for future performance gives to the other party an immediate right of election to continue to assert his strict contract rights or to accept the renunciation and sue upon that as a distinct cause of action."

In the same case the court adopted [page 1162 of 202 Iowa, page 705 of 211 N. W.] the following statement, cited in Roehm v. Horst, 178 U. S. 1, 13, 20 S. Ct. 780, 785, 44 L. Ed. 953, 958, from Johnstone v. Milling, L. R. 16 Q. B. Div. 460, 467:

"Such a renunciation does not of course amount to a rescission of the contract, because one party to a contract cannot by himself rescind it, but by wrongfully making such a renunciation of the contract he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission."

In Quarton v. American Law Book Co., 143 Iowa 517, 528, 121 N. W. 1009, 1013, 32 L. R. A., N. S., 1, the court said:

"It would be intolerable to hold that, if one party repudiates, renounces or abandons his contract, the other may

not treat the renunciation or repudiation as putting an end to it.''

See also Canfield Lumber Co. v. Kint Lumber Co., 148 Iowa 207, 127 N. W. 70.

Appellant contends the pleadings and proofs were insufficient to justify the cancellation of the written contract. This action differs from those in which the cancellation of contracts is the basis upon which the aid of equity is invoked. Here the case was necessarily brought in equity because its primary purpose was to establish and dissolve the partnership and for an accounting. In such actions the court is empowered to adjust and settle all the rights of the parties pertaining to and growing out of the subject matter of the action. Creger v. Fenimore, 216 Iowa 273, 249 N. W. 147. The cancellation of the written contract was merely incidental to the main action. Moreover, at said time the rights of the partners, growing out of this partnership contract, could have been adjudicated only in equity and all partnership rights may be adjusted in the accounting phase of the suit.

It is true appellee did not, in so many words, plead his election to treat appellant's renunciation as putting an end to the written contract. But we think that, under the circumstances of this case, the bringing of the action to dissolve the partnership and terminate its affairs evidenced such an election and with the proofs submitted was sufficient to justify the order of rescission or cancellation. Olson v. Brison, 129 Iowa 604, 106 N. W. 14.

Wherefore, the decree of the trial court is affirmed.—Affirmed.

MILLER, C. J., and GARFIELD, SAGER, HALE, BLISS, WENNERSTRUM, STIGER, and MITCHELL, JJ., concur.